# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

ACOUSTIC PROCESSING  )
TECHNOLOGY, INC.,  )
  )
  PLAINTIFF  )
  )
v.  )      CIVIL No. 09-407-P-H
  )
KDH ELECTRONIC SYSTEMS INC.,)
  )
  DEFENDANT  )

## MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND DEFENDANT'S MOTIONS TO DISMISS THE AMENDED COMPLAINT AND TO ENFORCE SETTLEMENT AGREEMENT

The issues on the pending motions are (1) sufficiency of the patent holder's Amended Complaint for patent infringement and breach of a license agreement; (2) whether the license agreement settled claims for previous infringement; and (3) whether the patent holder has made the case for preliminary injunctive relief on account of either patent infringement or breach of the license agreement. I have reviewed all the written materials, and I conducted a preliminary injunction evidentiary hearing on February 22, 2010. I now conclude that the Amended Complaint withstands the Motion to Dismiss; that, at this stage, I cannot conclude that the license agreement settled claims for previous infringement; and that the patent holder has shown a likelihood of success on the merits of its claims, but that it has not produced evidence of

irreparable injury that would permit me to issue a preliminary injunction.  The defendant's Motions to Dismiss and to Enforce Settlement Agreement and the plaintiff's Motion for a Preliminary Injunction are **DENIED**.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

#### *Acoustic Processing Technology, Inc., and the '334 Patent*

In 2000, Thomas Curtis and Steven Sidman developed a composite, two-stage "wave digital filter" that allows for efficient, low cost conversion of multiple input streams of lower resolution, high frequency data (such as analog audio signals) into more accurate, higher resolution, lower frequency digital data.  See Decl. of Steven Sidman ("Sidman Decl.") ¶¶ 10-25 (Def.'s Ex. 30). That same year, Curtis and Sidman assigned their patent rights to Acoustic Processing Technology, Inc. ("APT"), a Delaware corporation with its principal place of business in Maine.  Id. ¶¶ 5, 34.  Sidman is now APT's President and sole employee.  Id. ¶ 6.  Sidman testified that APT's corporate purpose is to develop various processing techniques for acoustics, with concentration on speech processing.  In 2003, APT filed a utility patent application for the invention.  Id. ¶ 33.  Curtis subsequently left APT and moved to the United Kingdom to run his own company, Curtis Technology.  APT received a patent for the wave digital filter on August 22, 2008.  See U.S. Patent No. 7,363,334 B2 ("the '334 patent") (filed Aug. 28, 2003) (Pl.'s Ex. 2).  Sidman and Curtis

---

[1] Through the Clerk's office, APT and KDH have informed the Court that they agree that, for purposes of the preliminary injunction, the record includes the testimony offered and the exhibits admitted at the evidentiary hearing held on February 22, 2010 and the Declaration of Mark T. Shaw (Ex. 3 to Pl.'s Resp. in Opp'n to Mot. for Prelim. Inj. (Docket Item 17)) (Docket Item 17-3).

have maintained personal and professional contact over the years, as demonstrated by Sidman's testimony and a series of e-mails admitted into evidence.

Claim 19 of the '334 patent describes the basic configuration of the two-stage wave digital filter:

> [A] [d]igital signal-processing structure in the form of programmed hardware comprising a plurality of early-stage, decimate-by-two, signal-processing agencies connected in a cascade series arrangement, said agencies each being associated with a first transfer function having a first transition bandwidth, and each having an output, and a later-stage, decimate-by-two, signal-processing agency selectively coupleable to different ones of said outputs, said later-stage agency being associated with a second transfer function having a transition bandwidth which is less than said first transition bandwidth.

'334 Patent col.16 l.50-61.  The innovation here is the sequencing of a number of previously-known wave digital filters ("Type 1"), which have good stop band frequency performance, with a single, newly-developed wave digital filter ("Type 2"), which has good transition band performance.  The patent does not claim the Type 1 wave digital filter.  Rather, it claims the new Type 2 wave digital filter and its *combination* with a series of Type 1 wave digital filters, the number of Type 1 wave digital filters varying according to the decimation (sample rate reduction) needs of particular applications.  The APT wave digital filter, which can be built using off-the-shelf parts, performs the work of multiple, high performance filters, using less power and fewer computing resources, to convert multiple streams of analog data input into high resolution digital data.

Sidman Decl. ¶ 23.  The inventors expected their device to be "adaptable to a very wide range" of signal processing applications.  '334 Patent col.1 l.16.

### KDH Electronic Systems and the T-3 System

KDH Electronic Systems, Inc. ("KDH") is incorporated and has its principal place of business in Pennsylvania.  Am. Compl. ¶ 2 (Docket Item 11).  In early 2005, KDH contacted APT's Sidman about developing a sonar system.  Sidman referred KDH to Curtis's company in the United Kingdom.  KDH subsequently teamed with Curtis to develop the "T-3 system," an underwater swimmer and diver detection sonar system for use in protecting ships, bridges, dams, and other shoreline installations.  Curtis developed source and object codes for designing, testing, and manufacturing the T-3 system and, in fact, built a prototype.  KDH focused on marketing.  Apparently, KDH obtained funds for the project from earmarks by the late Congressman John Murtha.  See Sidman Decl. ¶¶ 39-40.

By 2008, the relationship between Curtis and KDH had soured.  On January 22, 2008, Curtis e-mailed Sidman that he was thinking of breaking his agreement with KDH, but that the T-3 system incorporated the APT-patented wave digital filter, and that KDH therefore would likely approach APT about "licensing/royalties/buying" APT's technology for use in the T-3 system in the United States.  E-mail from Tom Curtis to Steven Sidman (Jan. 22, 2008) (Pl.'s Ex. 11).[2]  In March 2008, KDH tried to reach an agreement with

---

[2] APT has patent rights for the wave digital filter only in the United States.

Curtis to amend the "Teaming Agreement" for development of the T-3 system. A proposed contract amendment that KDH's lawyer sent to Curtis's lawyer provided that KDH would "use its best commercial effort to reach an agreement with [APT] regarding the use of the [wave digital filter] embedded in the receive front end [of the T-3 system]." Am. Teaming Agreement ¶ 11 (Pl.'s Ex. 31).  But Curtis and KDH failed to reach agreement.  On May 12, 2008, KDH filed a complaint in the Eastern District of Pennsylvania seeking a preliminary injunction ordering Curtis Technology to turn over all engineering and programming information for the T-3 system to KDH.[3]  In June 2008, while its motion was pending, KDH's president David Herbener travelled to the United Kingdom with KDH's legal counsel and Mark Shaw, an engineer from KDH subcontractor Sonatech, to collect the T-3 system from Curtis.  Herbener and Shaw saw Curtis test the T-3 system, and Curtis reminded them that the sonar included the APT wave digital filter.

In December 2008, KDH obtained a final judgment against Curtis Technology (and Thomas Curtis and Michael Curtis) that it "owns the entire source code for the T-3 System under the terms of [its] Teaming Agreement" with Curtis Technology.  KDH Elec. Sys. v. Curtis Tech. Ltd., 2008 U.S. Dist. LEXIS 104344, at *22 (E.D. Pa. Dec. 23, 2008).

---

[3] In August 2008, the district court with the consent of the parties ordered Curtis Technology to give KDH the source code and programming information for the T-3 system by September 5, 2008.  Order, Aug. 11, 2008, KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., No. 08-CV-2201 (E.D. PA filed May 12, 2008).

On February 18, 2009, two applications to patent the T-3 system were filed with the World Intellectual Property Organization ("WIPO"). The first listed Curtis as the applicant and inventor. WIPO Patent No. 2009/112798 A1 (filed Feb. 18, 2009) (Pl.'s Ex. 5). The second listed KDH as the applicant for countries other than the United States, and Curtis and Herbener together as the applicants and inventors for the United States. WIPO Patent No. 2009/114063 A1 (filed Feb. 18, 2009) (Pl.'s Ex. 4). The applications are nearly identical. The KDH application states in relevant part:

> Some suitable [wave digital filter] techniques are outlined in United States Patent Application US 20050050126 [the application that resulted in APT's '334 patent], which describes digital signal-processing structure . . . Each of these filters takes the form of (1) a concatenated assembly including one to a plurality of upstream, early-stage, decimate-by-two, signal-processing agencies connected in a cascade series arrangement, with each such agency possessing a first transfer function having a first transition bandwidth, and (2) a single, downstream, later-stage, decimate-by-two, signal-processing agency which possesses a second transfer function having a transition bandwidth which is less than the mentioned first transition bandwidth.

WIPO Patent No. 2009/114063 A1 at 34-35.

### The Licensing Agreement Between APT and KDH

On June 12, 2008, KDH's Benjamin Conaway contacted APT about licensing APT's technology for the T-3 system. KDH informed APT that it had been "developing a swimmer detection sonar with Curtis Technology" and that "[i]mbedded in the receive front end of the system is a [wave digital filter] engine proprietary to APT . . . based off your patent." E-mail from Ben Conaway to Sidman (June 12, 2008) (Pl.'s Ex. 14). APT forwarded a proposed license to

KDH on June 25, 2008, and Sidman pressed KDH about reaching an agreement in early July 2008 because he had learned that KDH planned to test the system in Rhode Island.   E-mail from Steven Sidman to Ben Conaway (July 7, 2008) (Pl.'s Ex. 15).   By August 2008, the parties were actively negotiating a license.   KDH's lawyer sent APT a proposed agreement, which had been revised to refer to "thirty[-]two (32) units of [the wave digital filters] which are incorporated into the existing prototype of the T-3 SYSTEM."   Redlined Patent Eval. License Agreement at 3 (Pl.'s Ex. 17).   APT and KDH executed a license agreement on October 29, 2008.  Sidman Decl. ¶ 51.

The Patent Evaluation License Agreement (the "Agreement") between APT and KDH is an integrated contract governed by Maine law.   Agreement at 9 (Pl.'s Ex. 7).   It includes the following provisions relevant to the current dispute.

First, the Agreement grants KDH a non-transferable, non-exclusive right and license to use and test the '334 patent wave digital filter "solely" for "internal evaluation" by KDH and for "demonstration" of the T-3 system to KDH's customers and prospective customers.   Id. at 2.   The Agreement states that KDH agrees and acknowledges that the license is limited to the manufacture and use "of the thirty[-]two (32) units . . . which are incorporated in the existing prototype of the T-3 SYSTEM."   Id. at 2-3.   The license explicitly excludes research and development on the APT wave digital filter or manufacture of wave digital filters for incorporation into T-3 systems for sale.

Id. at 3.   Under the terms of the license, KDH reserved all rights in the T-3 system "without use" of APT's technology.  Id.

Second, the Agreement requires the parties to maintain the confidentiality of information provided by APT to KDH (and vice-versa) pursuant to the Agreement and to return all such confidential information upon termination of the Agreement or the request of the other party.  Id. at 7-8. In the Agreement, the parties stipulate that any breach of the confidentiality provisions constitutes "immediate and irreparable harm" and will warrant injunctive relief.  Id. at 8.

Third, the Agreement imposes promotion, recordkeeping, and reporting requirements on KDH.  Section 13.1 requires KDH "actively" to promote and to demonstrate APT's wave digital filter.  Id. at 9.  Section 13.2 requires KDH to keep records of "all [wave digital filters] used and evaluated," "the number of units manufactured by [KDH]," "the location of each unit," "the identity and roles of the parties and any related subcontractors working with or assisting [KDH] in the evaluation and demonstration of the [wave digital filters]," and "any and all other information [APT] may reasonably request regarding the [licensed wave digital filters]."  Id.  In addition, the Agreement requires KDH to provide a "detailed report" including all this information at the time of the execution of the license and then within thirty days of the end of each quarter. Id. at 9-10.   Section 13.3 provides that if KDH does not comply with its promotional and reporting obligations, APT can terminate the Agreement "immediately upon notice."  Id. at 10.

Finally, Section 14.8 provides that KDH's breach of the license "will cause immediate and irreparable harm" to APT that will warrant injunctive relief. Id. at 11.

### The Termination of the License

KDH did not submit the required report when the Agreement was executed in October 2008. Sidman Decl. ¶ 78. KDH filed its first report in January 2009. Id. That report facially complied with the Agreement's requirements stating, for example, that a single T-3 system was located at Sonatech in California, but it disclosed neither that Sonatech had been assisting KDH to test the T-3 system at its facility near Santa Barbara and at Scripps Pier in San Diego nor that a planned test of the T-3 system at the Naval Undersea Warfare Center in Rhode Island in December 2008 had taken place. Id. ¶¶ 78-79. KDH did not file a report for the first quarter of 2009. Id. ¶ 82. In June 2009, APT contacted KDH and requested an update, specifying the following information:

  a. The entity and individuals with possession of the T-3 System that incorporates the Licensed Products;
  b. The type of evaluation and testing being performed by those individuals and entities with possession of that T-3 System;
  c. Confirmation that only system-level evaluation was being performed;
  d. The number of units of the Licensed Products that had been built;
  e. Disclosure of whether KDH had demonstrated the T-3 System to any end customers;

9

     f.  A description of the steps taken by KDH to protect confidential material disclosed to KDH by APT and to prevent the use of APT's patent rights and related technology by third parties; [and]

     g.  A list of any third parties who may have obtained confidential information disclosed to KDH by APT or who KDH suspects of using APT's patent rights and related technology.

Id. ¶ 83; Letter from John Carpenter to KDH (June 4, 2009) (Pl.'s Ex. 21). KDH answered with a one-sentence e-mail stating that "the status remains unchanged since the last update." Sidman Decl. ¶ 86; E-mail from Jonathan Moore to Evelyn Gledhill (June 8, 2008) (Pl.'s Ex. 22). APT responded the same day, noting the insufficiency of KDH's report, reiterating certain requests for information, and expressing concern over "leakage of APT's patented technology." Sidman Decl. ¶¶ 88, 90; E-mail from John Carpenter to Jonathan Moore (June 8, 2009) (Pl.'s Ex. 23). KDH did not respond. Sidman Decl. ¶ 93.

     In early July 2009, Curtis alerted Sidman to an article in *Roll Call* about the T-3 system in the context of earmarks from Congressman Murtha's office. The *Roll Call* article quoted David Herbener as saying of the T-3 system: "The current prototype is a prototype. It's not intended to be built in any kind of quantities. Ultimately, to have a production system, we would most likely change out components, hardware, probably rearrange components, maybe redesign." Paul Singer, Murtha Earmarks Funded Garment Company's Sonar Project, ROLL CALL, July 7, 2009 (Pl.'s Ex. 10). *Roll Call* also quoted Herbener saying that he had hired a new subcontractor and that "as funding permits we

firmly believe we can field an end item production in short order—possibly 3 to 6 months." Id.

On July 9, 2009, APT wrote to KDH complaining about KDH's failure to provide required reports and about Herbener's comments as reported in *Roll Call.* Letter from John Carpenter to Jonathan Moore (July 9, 2009) (Pl.'s Ex. 24). APT demanded a "complete, accurate, and truthful account of system status" by July 13, 2009. Id. at 2.

On July 13, 2009, KDH informed APT that the T-3 system was still located at Sonatech in California and that "[n]o further demonstrations and no further work has occurred to or with the sonar system since the demonstration at US Navy NUWC last December, 2008 which APT was informed of and made aware of prior to the test." Letter from David Herbener to Jonathan Moore (July 13, 2009) (attached to E-mail from Jonathan Moore to John Carpenter (July 13, 2009) (Pl.'s Ex. 25)).

On July 30, 2009, Sidman terminated the Agreement pursuant to Section 13.3. He demanded return of "all products, documents, and other materials containing, referencing and/or manifesting" the APT wave digital filter. Letter from Steven Sidman to David Herbener (July 30, 2009) (Pl.'s Ex. 26). Sidman cited KDH's failure to promote APT's technology under Section 13.1 of the Agreement and KDH's failure to provide required reports as required by Section 13.2. KDH rejected the termination on August 3, 2009. Letter from Wayne Streibich to Anthony Perkins (Aug. 3, 2009) (Pl.'s Ex. 27). By e-mail, it asserted that APT had "received the appropriate status update"

and that "KDH is actively expending significant time and funds to bring the sonar system to market."   E-mail from Wayne Streibich to Tony Perkins (Aug. 3. 2009) (Pl.'s Ex. 28).

On August 27, 2009, KDH received a contract with the United States Army for an upgraded T-3 system, which would cover 360 degrees of sonar scanning rather than the 180 degrees in the T-3 system prototype and thus require more channels of data input.[4]   KDH contracted with Sonatech to develop the upgraded T-3 system in September 2009.   KDH also attempted to renew the Agreement with APT pursuant to Section 4.1, but APT rejected KDH's tender of the annual renewal fee.

APT filed a complaint against KDH in this court on August 31, 2009. After KDH moved to dismiss, APT amended its complaint on November 2, 2009. The Amended Complaint contains three counts:  one for breach of the license agreement; one for patent infringement; and one for declaratory judgment that the Agreement was terminated and that KDH retains no rights in the '334 patent.  Am. Compl. ¶¶ 72-87.  APT filed its Motion for a Preliminary Injunction on November 12, 2009.  On November 17, 2009, KDH filed a Motion to Enforce Settlement Agreement and a Motion to Dismiss the Amended Complaint.   An evidentiary hearing on the preliminary injunction motion took place on February 22, 2010.

---

[4] KDH apparently lost its original contract with the U.S. Navy due to the delays caused by its dispute with Curtis Technology, but when the procurement officer overseeing the project moved from the Navy to the Army, KDH obtained a contract with U.S. Special Operations Command. See Singer, Murtha Earmarks.

12

**ANALYSIS**

Jurisdiction over the patent claims is based on this court's original jurisdiction over cases "relating to patents." 28 U.S.C. § 1338(a). APT's breach of license claim invokes federal supplemental jurisdiction over state claims closely related to a federal question. 28 U.S.C. § 1367(2); <u>see</u> Agreement at 9 (providing that Maine law controls the Agreement).

**I.     *Motion for a Preliminary Injunction***

APT moved for a preliminary injunction ordering KDH not to infringe the '334 patent; to cease using APT technology in the T-3 system; to return all products, documents and other materials referencing or manifesting the APT wave digital filter; and to file a sworn report detailing its compliance with the injunction within thirty days of its issuance. Pl.'s Mot. for Prelim. Inj. at 19 (Docket Item 13). At the February 22 hearing, however, APT narrowed its request to an order that the T-3 system remain under seal at Sonatech and that all confidential documents be held in escrow until the final outcome of this case.

To obtain a preliminary injunction, APT must establish that it is "likely to succeed on the merits" of its breach of license and patent infringement claims; that it is likely to suffer irreparable harm absent injunctive relief; that the balance of equities favors APT over KDH; and that an injunction is in the public interest. <u>Winter v. NRDC, Inc.</u>, 129 S. Ct. 365, 374 (2008) (citations omitted).

### A.      Likelihood of Success on the Merits

#### 1.      Breach of the Licensing Agreement (Maine Law)

There is a high likelihood that APT can prove, first, that KDH materially breached its license by failing to provide reports pursuant to Section 13.2 of the Agreement and, second, that Sidman's termination of the Agreement in July 2009 was effective.   Under Maine law, a material breach of contract justifies an injured party in regarding "the whole transaction as at an end." Associated Builders, Inc. v. Coggins, 722 A.2d 1278, 1280 (Me. 1999) (quoting Down East Energy Corp. v. RMR. Inc., 697 A.2d 417, 421 (Me. 1997)).   Maine courts determine materiality using "traditional contract principles," id. (citing Down East Energy, 697 A.2d at 421), including:   (a) whether a party will not receive a reasonably expected benefit; (b) whether a party can be compensated for deprivation of the benefit; (c) whether the breaching party will suffer forfeiture; (d) whether a breaching party is likely to cure his nonperformance; and (e) whether the breaching party's conduct "comports with standards of good faith and fair dealing," id. at 1280 n.1 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)).   This standard of materiality is applied "in the light of the facts of each case" in order to "secur[e] for each party his expectation of an exchange of performances."   RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. a (1981).

There is nothing ambiguous about Section 13.2.   It requires reports including specific information on a fixed schedule, the kinds of information that would be material to any patent holder licensing the use of its patent

rights. Its requirements are not unduly burdensome and could easily be satisfied with an e-mail listing the specified information. Section 13.3 provides for immediate termination of the license (without an opportunity to cure) if KDH fails to provide required the reports. There can be little doubt that a breach of the reporting requirements constitutes a material breach of the Agreement. The breach denies APT a benefit that it reasonably expected.[5]

In spring 2009, APT repeatedly asked KDH to provide the required reports. KDH repeatedly failed to do so in a timely and complete manner, hardly a showing of good faith and fair dealing.[6] KDH argues that it was not required to provide APT with all the information APT requested. Whether or not that is so, KDH's "report" of June 8, 2009 neither supplied all the information called for in the Agreement nor responded meaningfully to APT's June 4 request for additional information regarding KDH's use of APT's technology. Alternatively, KDH argues that it did not have to provide APT with information because APT could and did get the information independently. Having to do its own sleuthing, however, is not what APT bargained for in the license agreement. There is a material difference between KDH informing APT directly about its use of the wave digital filter and APT learning second-hand about KDH's activities. The latter forces APT to expend time and energy investigating its own client, precisely what the Agreement's reporting

---

[5] At the February 22 hearing, Sidman also testified that the reporting requirements of Section 13.2 were an essential feature of APT's bargain with KDH. <u>See also</u> Sidman Decl. ¶¶ 59-62.
[6] Although I recognize that KDH also failed to provide an initial report in October 2008, I base my ruling on KDH's conduct in 2009.

requirements should make unnecessary.  KDH's failure to abide by the requirements of Section 13.2 deprived APT of the security and certainty it had the right to expect, and it shows no likelihood that KDH is likely to cure its nonperformance in the future.  There is no compensation for that loss.[7]  I have no difficulty concluding that APT is likely to prove that KDH materially breached the Agreement, that APT effectively terminated the license with its July 30, 2009 notice, and that KDH's later attempt to renew the license was therefore ineffective.

### 2.    Patent Infringement

APT is also likely to prove that KDH's T-3 system infringes the '334 patent.  Usually, to obtain a preliminary injunction, a patentee must show that its patent is valid and that the suspect product infringes the patent.  See Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009). Here, KDH has not challenged the '334 patent's validity.  Thus "the very existence of the patent with its concomitant presumption of validity" satisfies APT's burden on this issue.  Id. at 1377 (citing Purdue Pharma. L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1365 (Fed. Cir. 2001)).

---

[7] KDH suffers little forfeiture (one of the factors) here because the license is so narrow. Specifically, all it allows is use and testing of APT's wave digital filter for KDH's internal evaluation, for manufacture of thirty-two wave digital filters for an additional T-3 prototype, and for demonstration of the T-3 system prototypes to KDH's customers and prospective customers.  Agreement at 2.  The license specifically excludes research and development of APT's technology as well as manufacture of the APT wave digital filter as a component of the T-3 system for sale.  Id. at 3.  By limiting KDH's license to the thirty-two wave digital filters in the existing T-3 prototype and an additional thirty-two for a second prototype, APT effectively precluded KDH from increasing the digital signal processing capacity of the T-3 system by adding additional wave digital filters.  KDH is free to develop the T-3 system without use of APT's technology.

Establishing a likelihood of success on an infringement claim usually requires a claim construction.  See Chamberlain Group, Inc. v. Lear Corp., 516 F.3d 1331, 1339-40 (Fed. Cir. 2008) ("[A] correct claim construction is almost always a prerequisite for imposition of a preliminary injunction.").  But at the preliminary injunction stage, claim construction need not be conclusive and is subject to revision as the case develops.  Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("[A] trial court has no obligation to interpret [a] claim . . . conclusively and finally during a preliminary injunction proceeding.").  Moreover, claim construction is not necessary when the record indicates that a defendant's device simply copies and incorporates patented technology, especially where a defendant has admitted that its product incorporates a plaintiff's invention.  Toro Co. v. Deere & Co., 355 F.3d 1313, 1322 (Fed. Cir. 2004); see also Pharmastem Therapeutics, Inc. v. Viacell, Inc., 491 F.3d 1342, 1351 (Fed. Cir. 2007) ("[T]here is no prohibition against using the admissions of a party, whether in the form of marketing materials or otherwise, as evidence in an infringement action; such admissions are entitled to weight along with all other evidence of infringement.").

KDH has admitted repeatedly that the T-3 system incorporates the wave digital filter covered by the '334 patent.  In 2008, KDH approached APT for a license because, KDH said, "[i]mbedded in the receive front end of the [T-3] system is a [wave digital filter] engine proprietary to APT . . . based off your patent."  E-mail from Conaway to Sidman (June 12, 2008).  The Agreement

17

between KDH and APT explicitly refers to "use of the thirty[-]two (32) units of the [wave digital filter] . . . incorporated into the existing prototype of the T-3 SYSTEM."  Agreement at 2-3.  David Herbener has testified that Curtis used the APT wave digital filter in the T-3 system and that KDH sought a license from APT to continue using it.  Hr'g Tr. 44:11-20, Sept. 26, 2008, <u>KDH Elec. Sys., Inc. v. Curtis Tech, Inc.</u>, No. 08-CV-2201 (E.D. PA) (Ex. to Pl.'s Reply Mem. in Support of Mot. for Prelim. Inj. (Docket Item 20)) (Docket Item 20-4).  KDH does not even attempt to maintain that the T-3 system does *not* include APT's technology.  Instead, it claims only ignorance on the subject, despite its earlier admissions, and argues that APT cannot meet its burden of proof to show infringement.  It says that without Curtis's testimony about what he used in developing the T-3 system, "genuine issues of fact still remain as to whether [the] T-3 System actually contains the patented [wave digital filter]."  Def.'s Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. at 2 (Docket Item 17).  Fair enough.  Curtis has not testified, and APT has not finally prevailed on its claim.  But APT need only show a *likelihood* of prevailing at this stage.  It has shown a reasonable likelihood of prevailing based on:  KDH's teaming with Curtis (the co-inventor of the APT wave digital filter) to develop the T-3 system; KDH's decision to seek a license for APT's technology for use in the T-3 system; KDH's admissions that the T-3 system incorporates APT technology[8]; and the

---

[8] The WIPO patent application for the T-3 system filed by KDH may also constitute an admission that the T-3 system incorporates APT's technology.  The relation between the WIPO application filed under Curtis's name alone and the application filed on behalf of KDH, Curtis, and Herbener is not entirely clear to me, but assuming (without deciding) that the KDH
*(continued next page)*

testimony of Mark Shaw (the KDH subcontractor) at the February 22 hearing that KDH actually possessed the schematics for the wave digital filter in the T-3 system and that Sonatech consulted the '334 patent when analyzing the T-3 system.  There is therefore every reason to believe that the T-3 system actually incorporates APT's technology and that KDH's testing of the sonar system without a license infringes the '334 patent.  See Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("A patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence." (citing Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986)).

**B.    *Irreparable Harm***

For its preliminary injunctive relief, APT requests only that the T-3 system remain under seal in the hands of Sonatech and that all confidential documents be held in escrow until the final outcome of this case.  It is in that connection that I consider whether APT has shown irreparable injury if it is denied this relief.  The parties have not cited the most recent Supreme Court and Federal Circuit decisions on injunctions in patent cases.  In eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), the Supreme Court held that a district court's discretion to grant or deny permanent injunctive relief in a

application was filed by KDH and accurately describes the T-3 system, I tentatively find that the '334 patent claims cover the wave digital filter described in the WIPO application.  The WIPO application both references the '334 patent as a source of "[s]ome suitable [wave digital filter] techniques," WIPO Patent No. 2009/114063 A1 at 34, and, in relevant part, reads on Claim 19 of the '334 patent nearly word-for-word, id. at 34-35.  See Decl. of Steven Sidman ("Sidman Decl. II") ¶ 21 (Ex. A to Pl.'s Reply) (Docket Item 20-1) (showing overlap of claims).

patent infringement case "must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards," 547 U.S. at 394; see also 35 U.S.C. § 283 ("[I]njunctions [may be granted] in accordance with the principles of equity to prevent the violation of any right secured by patent."). The Court therefore rejected the Federal Circuit's previous "general rule" that injunctions should routinely issue in successful patent infringement cases absent "exceptional circumstances." eBay, 547 U.S. at 393-94. Although eBay dealt with permanent injunctions, its holding applies equally to preliminary injunctions because, according to the Federal Circuit, the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1364 (Fed. Cir. 2008) (quoting Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n.12 (1987)). Strangely, the parties here both agree that in a patent infringement case irreparable harm is *presumed* when a party has shown a clear likelihood of success. Pl.'s Mot. for Prelim. Inj. at 14; Def.'s Resp. in Opp'n at 19. But the Federal Circuit disagrees. In Automated Merchandising Systems, Inc. v. Crane Co., 2009 U.S. App. LEXIS 27667 (Fed. Cir. Dec. 16, 2009) it said: "[T]he presumption of irreparable harm, based just on proof of infringement, [has been] discarded. The burden is now on the patentee to demonstrate that its potential losses cannot be compensated by monetary damages," id. at *9 (citing eBay, 547 U.S.

at 392-94).[9]  See also Munaf v. Geren, 553 U.S. 674, 128 S. Ct. 2207, 2219 (2008) ("A preliminary injunction is an 'extraordinary and drastic remedy' . . . never awarded as of right." (citations omitted)); Abbott Labs., 544 F.3d at 1365 (Fed. Cir. 2008) ("There is no reason why patent cases require unique treatment." (citing eBay, 547 U.S. at 394)); Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1326 (Fed. Cir. 2008) (recognizing that eBay abrogated the Federal Circuit presumption in favor of permanent injunctions).

Thus, to obtain injunctive relief, a party can neither rely upon a presumption of irreparable harm nor point to merely possible harm.  Instead, whether a patent case or not, it must show that irreparable harm is likely.  See Winter, 129 S. Ct. at 375-76 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)); see also CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008) (explaining that the first two eBay factors are satisfied by showing a "substantial injury that is not accurately measurable or adequately compensable by money damages" (citation omitted)); In re Rare Coin Galleries, Inc., 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or

---

[9] Although Automated Merchandising Systems does not carry precedential weight, its reasoning is persuasive.  See Fed. Cir. R. 32.1(c) & (d).

unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction." (citations omitted)).[10]

I turn, therefore, to the showing of irreparable harm on the two causes of action.

### 1. Breach of License

By showing a likelihood of success on the merits of its breach of license claim, APT has also shown a likelihood of proving that KDH should return to APT all "technical, business, financial, or other information" marked "Confidential" or "Proprietary" that APT provided to KDH under the license. Agreement at 7. The Agreement provides both that upon termination of the Agreement or upon request, each party must return all confidential material to the other party and that the parties "acknowledge and agree that any breach of the confidentiality obligations . . . will constitute immediate and irreparable harm . . . [warranting] injunctive relief." Id. at 8. I take these provisions in the Agreement to indicate the understanding between the parties and thus, arguably, to limit KDH's arguments on irreparable harm, but the contract is not dispositive. Rather, I evaluate the actual need for injunctive relief based on the factual record before me. See, e.g., Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1381 (Fed. Cir. 2006) (holding that quantifying a monetary measure of harm in a contract did not preclude a showing of irreparable harm); Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res., 837 A.2d 129, 133

---

[10] Neither party asserts that the standards for assessing irreparable harm should vary between the claim for state-law license breach and the federal claim for patent infringement.

(Me. 2003) ("When the record does not support a finding of irreparable injury, injunctive relief must be denied."  (citing <u>Town of Charleston v. Sch. Admin. Dist. No. 68</u>, 798 A.2d 1102, 1104 (Me. 2002)).

APT has provided no evidence of what confidential information it gave to KDH.  Sonatech's Mark Shaw testified that he had received schematics for the wave digital filter in the T-3 system and a version of its source code from KDH, but that he had returned them to KDH (apparently because KDH had to return them to Curtis).  KDH obtained documents from Curtis as a result of the lawsuit in the Eastern District of Pennsylvania, but there is no showing how these documents are covered by the confidentiality provisions in the Agreement.  Moreover, APT does not contend that it has rights over Curtis's activities in the United Kingdom, and it has not asserted here that Curtis wrongfully gave confidential documents to KDH.

Even assuming that KDH has documents subject to the return obligations of the license agreement, APT has not shown that KDH's failure to return them reasonably threatens actual irreparable harm.  Indeed, at the February 22 hearing, APT's lawyer admitted that he did not know what confidential documents KDH and its subcontractor Sonatech possess.  APT has not shown that it will suffer irreparable harm in the absence of an injunction ordering KDH to return unknown confidential materials.

### 2.    *Patent Infringement*

APT argues that it will suffer irreparable harm from KDH's infringement of its patent due to "seepage":  "Without stringent up-front control of [wave

digital filter] technology, the likelihood of technology seep threatens to deprive APT of much of the value of its patent without hope of recourse."  Pl.'s Mot. for Prelim. Inj. at 15.   APT cites authority recognizing that loss of market share and revenue, price erosion, and loss of goodwill can constitute irreparable harm but, as KDH notes, Def.'s Resp. at 19, APT cites no authority for the proposition that an injunction should issue to stop "viral dissemination" of a technology, Pl.'s Mot for Prelim. Inj. at 16.   Rather, APT analogizes "seepage" to "loss of market share":   "If APT's technology is incorporated into other projects without notice, APT will lose the benefits that would otherwise have accompanied the licensing of its technology for those projects."  <u>Id</u>.   At the February 22 hearing, APT presented no evidence that "seepage" was actually occurring or that APT is losing market share to KDH or to competitors.  As the Federal Circuit said recently, "lost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the patentee practices the invention.'" <u>Automated Merch. Sys.</u>, 2009 U.S. App. LEXIS 27667 at *8 (quoting <u>Nutrition 21 v. United States</u>, 930 F.2d 867, 871 (Fed. Cir. 1991)).   Indeed, APT presented no evidence that it has been in the market at all (other than by licensing its technology to KDH).  Instead, Sidman testified that he worries that if APT allowed KDH (its "first licensee") to use APT's technology improperly, then the "possibility of even unintended proliferation . . . kind of guts the

24

value" of the patent.  Sidman has speculated that the APT wave digital filter may have been shared with the "agencies of the U.S. government," Sidman Decl. ¶ 141, but at the February 22 hearing, APT did not present any evidence that its technology has in fact been co-opted by the military.  To be sure, APT maintains that the nature of its technology makes detection of such infringement very difficult if not impossible, but potential infringers do not need to rely on KDH to get access to APT's technology.  Sidman testified that the APT technology is not "hardened" or "encrypted"—"it's simple and it's out there."  And as Sidman admitted on cross-examination, the '334 patent, which is publicly available, enables construction of the APT wave digital filter.

APT has maintained consistently that it is willing to enter a new license agreement with KDH.  See Sidman Decl. ¶ 142.  At the February 22 hearing, Sidman testified, "All we ask is that [KDH] tell us what is going on and what they actually need, and we will do, come to agreement to come to an appropriate license to handle whatever they need."  It is clear that APT is willing to forego patent exclusivity for compensation, and while APT's willingness to license its technology does not necessarily preclude injunctive relief, eBay, 547 U.S. at 393, it suggests that any injury to APT "would be compensable in damages assessed as part of the final judgment in the case," High Tech Med. Instr. v. New Image Indus., 49 F.3d 1551, 1557 (Fed. Cir. 1995) (citing T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987)); see also Abbott Labs., 544 F.3d at 1362 ("[W]hen the patentee is simply interested in obtaining licenses, without itself

engaging in commerce, equity may add weight to permitting infringing activity to continue during litigation, on the premise that the patentee is readily made whole if infringement is found.").

Given that APT has not asserted that KDH cannot respond in damages for any infringement found at trial and that APT is willing to license its technology and given the lack of evidence that APT is likely to suffer loss of market share or lost revenues, I conclude that APT has failed to meet its burden as to irreparable harm. Analysis of the other eBay factors (balance of hardships and impact on the public interest) is therefore unnecessary.

The plaintiff's Motion for a Preliminary Injunction is **DENIED**.

## II.    *Motion to Dismiss Amended Complaint*

The motion is **DENIED**. The Amended Complaint (and its attachments) clearly allege sufficient facts to show that APT has "plausible" claims for breach of the license and for patent infringement. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.   *Motion to Enforce Settlement Agreement*

KDH filed its Motion to Enforce Settlement Agreement at the same time it filed its Rule 12(b)(6) Motion to Dismiss. It seeks to preclude any claims for infringement prior to the date the license agreement was signed, namely October 29, 2008. Am. Compl. ¶ 9. Although the so-called Motion to Enforce

cites no Rule of Civil Procedure on which it is based, I treat it as a motion to dismiss based on an affirmative defense of accord and satisfaction or release.[11]

An affirmative defense or avoidance will support a motion to dismiss only where it is "(1) definitively ascertainable from the complaint and other sources of information that are reviewable at this stage, and (2) the facts establish the affirmative defense with certitude." Citibank Global Mkts., Inc. v. Santana, 573 F.3d 17, 23 (1st Cir. 2009) (citing Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008)).  On a Rule 12(b)(6) motion, I do not consider materials outside the plaintiff's complaint unless they are "documents the authenticity of which are not disputed by the parties," "public records," "documents central to plaintiffs' claim," or "documents sufficiently referred to in the complaint." Gargano v. Liberty Int'l Underwriters, 572 F.3d 45, 48 n.1 (1st Cir. 2009) (quoting Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)).  I "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs" to determine if the plaintiff has alleged "a plausible entitlement to relief." Id. at 48-49 (quoting Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008)).

---

[11] The defendant's Reply implies that KDH believed that it had moved for a species of summary judgment.  See Def.'s Reply in Support of Mot. to Enforce Settlement Agreement at 3 (Docket Item 22) ("Remarkably . . . APT did not file any affidavits or present any evidence to the Court which would establish its intent at the time the parties entered into the License Agreement.").  The Motion to Enforce plainly does not satisfy the requirements of Local Rule 56.  The defendant suggests that I should treat the underlying question in the same way I considered the issue in Ramirez v. DeCoster, 142 F. Supp. 2d 104 (D. Me. 2001).  However, Ramirez involved a settlement reached in the course of litigation that was then before me, whereas here KDH is relying on an agreement it says that it reached long before litigation occurred.

Here, APT has not alleged anything regarding a release of claims in its Amended Complaint, and while APT attached a copy of the Agreement to its Amended Complaint, KDH does not contend that the Agreement itself includes a release. Therefore, based on the materials that I can properly consider in connection with the Amended Complaint, the Agreement does not preclude APT's claims.

Even if I consider KDH's additional documents, I do not reach a different conclusion. KDH argues that the Agreement "was just one part of a larger agreement between the parties to resolve the dispute which arose between them" and that the full scope of the Agreement "was reflected in the exchange of e-mails and letters" between the parties. Def.'s Reply at 4. KDH points first to the correspondence between the parties before the Agreement was executed. See E-mail from Jonathan Moore to Tony Perkins (Sept. 29, 2008) (Def.'s Ex. 1(g)). The Agreement, however, includes an unambiguous integration clause: "This AGREEMENT constitutes the entire agreement and understanding between the parties and supersedes all prior and contemporaneous agreements and understandings with respect to the subject matter herein." Agreement at 9. Under Maine law, such clear language "precludes the implication of any extrinsic promises." Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp., 868 A.2d 220, 225 (Me. 2005); see also Handy Boat Serv. v. Professional Servs., 711 A.2d 1306, 1309 (Me. 1998) ("Extrinsic evidence concerning a specific provision of an integrated agreement may not be considered unless the court determines the language of that provision to be ambiguous." (citing McCarthy v. U.S.I.

Corp., 678 A.2d 48, 51-52 (Me. 1996)).  An integrated contract can contain an implicit, unstated, but necessary term, Seashore Performing Arts Ctr. v. Town of Old Orchard Beach, 676 A.2d 482, 484-85 (Me. 1996), but KDH has not shown that the release of all pre-license patent infringement claims is necessary to effectuate the licensing agreement.  Indeed, the sharp limitations on the license granted by the Agreement are inconsistent with a release of all claims.

KDH also points to an e-mail that its lawyer sent APT on October 30, 2008, the day after the Agreement was executed.  The e-mail states that KDH "only signed [the] Agreement . . . in an attempt to resolve the dispute that exists between our clients regarding [KDH's] use of [the wave digital filter]."  E-mail from Jonathan Moore to Tony Perkins (Oct. 20, 2008) (Def.'s Ex. 1(i)). This e-mail appears to be an attempt to write a condition into the Agreement that KDH did not obtain in the Agreement as executed.  But the Agreement itself requires that all modifications be in writing and signed by the party against whom they are to be enforced.  Agreement at 9.  KDH has not produced a written and signed modification of the Agreement by which APT released all its patent infringement claims against KDH (or even only those claims that might have accrued prior to the Agreement).  Having reviewed the Agreement and the correspondence between the parties, I cannot conclude that APT released any claims for patent infringement by KDH.

The Agreement itself therefore dooms KDH's affirmative defense at this stage of the case, where I draw all reasonable inferences in the plaintiff's favor.

KDH may prevail on its affirmative defense at trial, but I cannot conclude on the record before me that KDH's affirmative defense has been established with certitude.

The Motion to Enforce is **DENIED**.

**CONCLUSION**

For the foregoing reasons, the plaintiff's Motion for a Preliminary Injunction, the defendant's Motion to Dismiss, and the defendant's Motion to Enforce Settlement all are **DENIED.**

**SO ORDERED.**

**DATED THIS 19TH DAY OF MARCH, 2010**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**